Good morning, Your Honor. This is Mois v. Wynn, and he must be the prosecutor. Yeah, good morning. Your Honor, this is another case we've done for the year. I look forward to it. I'm Mois. I would like to reserve three minutes for rebuttal, and may have to use the court. Looks like we have the last on the clock, so I'll use it. Okay. Thank you, Your Honor. In this case, the District Court, we are primarily likely to follow the secret judgment standard. Mr. Mois, as an all-moving party, should have had the benefit of the evidence being viewed in the likelihoods favor of all to herself, should have had all reasonable inferences forewarned in her favor, and any credibility issues, she thought of them as an all-circumvented Wynn's favor, and Wynn's version of the events as was done here. The District Court, at least in the custody, invoked the Honest Belief Rule or Honest Belief Contract. This Court has never squarely addressed that issue. There's none of that in vain, but the closest it's come is in the Villa-Yamero, Villa-Romeo v. Lullaby on air, and that case sort of talks about looking at what the employer honestly believes, and the District Court did that in this case, and that type of view, that Honest Belief Rule, at least the way it was used here, is inconsistent with summary judgment standard because it necessarily requires or allows the Court to view the evidence and view everything in the favor of the moving party, the defendant in this case. This Court has repeatedly said that a full airing of cases, especially indiscrimination cases, a full airing is necessary because they're so factually intense, and a full airing of it in front of the entire fact is really necessary to get to the bottom of what happened in many of these cases. So the... I'm not sure why the Honest Belief Doctrine issue matters much here. I mean, basically, Lynn is saying he thought she was working somewhere else, and we thought that she was working there against our policies, and also in a way that showed that she was lying to us about her disabilities. Whether or not they had an honest belief in all those things, if they even had an honest belief in some of them, or even somewhat believed some of them as they were firing her because of those beliefs, isn't that another sign that they were firing her because she was disabled? Well, they were firing her based on... I believe they were firing her primarily because of what was known as a true claim. You know, what was known as a true claim is a true crime, and it's importantly to cover that up. Well, is the evidence really of that what even she knew that were surveilling her? I mean, they clearly... Maybe they weren't 100% certain that they were not honest, but most people mostly believe for something. They had some kind of interest in her activities, and it was well-established by what they had done so far. So why doesn't that have very strong evidence? Why isn't that a very strong way to show that her argument there was because of disability is just not right? Well, let's do another one. Also, the retaliation for the... What was my question? So the main thing is that they didn't really give her a chance to explain herself or talk back to her and basically barred her from telling her issues. As far as it doesn't exist, if they think that it's because of me. So they didn't give her an excuse to explain. So if they had given her a chance to explain, maybe she could have convinced them. But the point is, without the chance to explain, they continue to believe she's doing this work that's improper or somehow showing she's dishonest. And so why that's a reason that's not a retaliatory reason and not a juridictory reason, it might be a wrong reason, but I don't know that there's a law conspiring her for surveillance that wasn't substantive. Well, but their motive is really called into question by what actually took place here. They had put a surveilling her actually for a number of months, and it wasn't until approximately April 23rd when a manager, another manager, another manager in the emergency department, whose name was, sorry, excuse me, Pedro Gutierrez, and we have his e-mail, it's an ex-president, 3, page 340. He says that he believes that she might be working at Cesar's Palace or she heard that and that she might have been working full duty or, you know, not full duty. And based on that, they decided they're going to send surveillance out again. And interestingly, that same day... But what is the evidence that that was retaliatory or discriminatory? Right. So what they did is that today they contacted York, their third-party administrator for works compensation, who then contacted the security, or the surveillance people, and said, okay, let's go out and surveil her. We're giving you a $2,000 budget. And literally, like, within an hour, they were to make us an on-out. She literally said, we're on full duty, so we don't really need to do this. And then today is, like, on the 25th of April, and they say, no, go ahead and do it. We'll only give you half the budget, and we need you to get her married, her uniform. I thought, punch this back at working full duty and winning. So the only reason to continue to surveil her and to continue to go through this is if they were continuing on with their attempt to, you know, terminate her employment, which really goes back to April 19th, when we have emails. I mean, they'll be... But how would terminating her employment, so if she has her old workers come complain, presumably it gives you TVP, even if they terminate her? I don't quite understand the logical chain. Right. So, you see, when she has the new workers come in for you on May 3rd... But that's after. So they can't be retaliating against her until it doesn't happen again. Well, there were complaints. They held them back to September 2012. She got the other complaints, and I believe the way the surveillance shows that they were mistrustful of her, they didn't like her complaining, the fact that she had a number of complaints. And when they go ahead and, you know, issue this order to surveil her, even though she's going to be working full duty, while she's working at Sister's Palace, her policy is that she can work at Sister's Palace as long as, while she's on FMLA, if she's not exceeding the doctor's restrictions when working at another job, that's perfectly fine for her to be working there. So they're chasing her now. They're trying to get evidence that they're doing something wrong so that they can use that protection for instance. The very healthy issue of her pretext. They wanted to get this reason so they could fire her because they didn't like her. So once they get the reason that she really is doing this thing, then how is that still retaliatory? Because they're turning a blind eye to what was really going on when she wasn't working beyond her restrictions. If they'd asked her for that, if they'd told her specifically what they wanted from Sister's Palace, she could have cleared herself of them. They weren't interested in that. What they wanted to do was to fire her. They wanted to get rid of her, and they're going to work with some of the decision-makers, and they need to accommodate her under the ADA. All of that is something that they wanted to essentially circumvent. I get that. And I get that. I understand you. Yeah, I was going to get an argument from the producer there as well, and I can understand that. But the question is how do you tie it back to, and I think that maybe folks just failed to hear here, how do you tie it back to the retaliation for the specific protected activities? I mean, maybe it's just a like, or maybe the last one is maybe not legitimate reasons, but non-illegal reasons. It might work. They work together. Obviously, it's not our thing. That's another problem as well, because who knows? She might come out of secrecy or whatever. I mean, you have to do more than slug it out together. I mean, you have to show that, you know, believing your evidence that it's tied to potential activities. How do you do that? Well, with respect to the new, and again, I think a lot of these are very factual and detailed questions. I'm sorry. I know. I know. I think we're all going to, you know, you're clearly as much of an analyst when we're asking you these questions what are you going to be pointing to at that time? I'm going to go back to the piece of the law. Okay. Well, when she filed and gets injured again on May 3rd, and she has a day worker's compensation claim, they put her out. They don't follow their own policy. In other words, they're looking to fire her when this new injury happens. They don't follow their own policy. Their own policy is to give all injured employees a combination through a temporary light duty job assignment. They have an extensive policy that deals with that. And here they don't. They put her out involuntarily without talking to her, without having any kind of interactive process with her, without having any kind of individualized assessment. They just say, we're putting you out. I don't think I'm going to let you leave. I want you to just leave the task force. You have medical certification for that. She didn't have research. She's not a doctor. They also have a license for term arguments, so this foreign institution is used throughout LA. So they put her out. They put her out before, but I mean not after any other workers' compensation claims. So does it then add some weight at least to their claim that at that point there wasn't light duty that they could give her? Maybe they could give it to other people who are insured or something, anything you can think of? Well, so a couple of things about that. First of all, they had always provided that to her before, and now they're not going to. And, in fact, we have an e-mail, which is part of our Remembrance of Disabilities Act claim, that says she can't work back here until she's released full duty. That's like a 100% yield policy that is, per se, in violation of the ADA. And you just heard us discuss what their general policy is doing. Right. So is that not following their general policy? Well, their general policy, no, it's two different policies. First of all, the workers' compensation light duty policy, that's one thing. But a policy that says, we're not letting you come back to work here until you're 100% full duty, that is, per se, in violation of the ADA. It looks like there's no process of monitoring. They can't process their in-consultation. Well, they're not following the first one. That's the problem. They weren't doing it in a policy way. I think it ends up being because they're going to deny the claim. And in that same May 20th e-mail from Stony Brook, who's the workers' comp manager, he mentions to his supervisor, Ms. Rivera, that, yes, we are going to be denying the claim. What is the evidence that your client has offered that she engaged in the interactive process about whether there was compensation? When they said, we don't have light duty for you, what did she do? And should she engage in the interactive process at that point? Well, she had always been ready, willing, and able to work the light duty job that she had. Here, she wasn't given, really, the opportunity to participate in any interactive process, because they put her out on leave for a good amount of time. So did she try? Did she request a meeting? Did she ask to stop being charged? Did she do anything? No, I don't think she's meeting the record. But if it was a scandal, she got both days. Well, you're out on leave, too. You're out on leave. But she's out on leave for a good amount of time. Once she came back, it was to be paid for a vacation day while she was out. Beyond that, I don't think there was any compensation. No, is there? Do you have any cases as if that's adequate, that your efforts to engage in the interactive process would be adequate? Well, I think we cite to the EEOC compliance where it talks about what is required of an employer and what an employer knows that an employee is unable to do their regular job. It puts the onus and the burden on the employer to engage in the interactive process. It's the history, I think, of our brief. I think it's a very clear case. This court's sentence has an opinion where it talks about what triggers the interactive process, and it talks about when an employer should initiate a reasonable compensation interactive process without being asked if the employer knows that the employee has a disability. And clearly they do stand a disability, or they put it on leave unilaterally. And she definitely had, you know, as an opportunity to do so. Okay. So I'll move along. So the other thing I want to say real quickly about the Americans with Disabilities Act is... I don't know if this is what you were going to talk about. What's that? You were going to say something about the EEOC. Oh, I'm sorry. I thought you were going to talk about it. Yeah, I thought you were going to talk about it. Just real quickly, the district court said that the enforcement of the EEOC reasonable compensation I don't think unless an employee has a disability that's not a reasonable compensation. They need to try and get it at work, and they need to try and get it at work until you work with them. That's what the EEOC is all about. Just saying you're on a leave and that's a reasonable compensation. That's a reasonable compensation. Okay. Okay. All right. Let's move on. Good morning, Your Honors. I'm Jen Serafino, representing the EEOC in Las Vegas, Ohio. Thank you. I'm here to address the termination decision against Ms. Moises in sufficient return to her discharge. She is a socialist and relates to the honest-to-god reasonable relief doctrine. I would like to discuss the ADA disability claims that Mr. Camp wrote. And I'd also like to talk briefly about the K-07 claims that the enforcement is making, questions that you may have for me. We've heard you discuss a little bit about the termination reason here, that she was terminated because she was working for another employer in the same job. There was not a problem, I guess, with the company that I was hired. It's against the underlying policy. You cannot be out on an underlying leave for your stated reasons. You said that I have limitations, I can't use my right arm, I can't perform the essential functions of my job. I'm sorry. What's the answer to my question? I'm sorry, can you say the question again? I'm sorry, can you say the question again? Yes, sir. I'm sorry, can you clarify? It's not against the employer's policy to work for another employee or for another employer? You are correct. There is no general policy against having two jobs. However, when a familiar policy says that you cannot be out on a familiar leave, or take care of whatever medical condition you have and work in consistent jobs and using the same types of job duties at another job, so you can't be out on a familiar leave. What they do is they see her going into another employer and nobody enters. They don't follow her. They don't. They don't see what she's doing. They don't ask her what she's doing and how do we know or how does the employer know that she isn't having any kind of liability and when wasn't, were you able to hear from her? Well, sure. No, actually, the investigation firm that conducted the investigations, the investigations, they actually did follow her. He did follow her into the establishment and tried to see what exactly she was doing at CSER. They weren't able to determine that. Okay. I didn't hear what they pointed, but the point is they weren't able to figure it out because as far as they knew, she wasn't doing anything consistent with her representations about her ability to work. Right, so what we have here, though, this is essential. So far, we have nothing. Well, so what we have, though, is the design of the investigation. That's right. That's right, isn't it? So far, we have nothing. We have a little more than nothing because she worked as a kitchen worker at Wynn and she worked as a kitchen worker at Caesars Palace. But you said they didn't know what she was doing at Wynn's. Did you know? So that's what you said. Correct. They didn't know the specific job functions she performed, let's just say May 4th, the day after her workers' compensation injury at Wynn, but they did have her do a processing meeting with her in Caesars, sorry, I'm forgetting stuff. So we still have nothing. Right? So we still have nothing. But they go in, they try to figure out they have nothing. They have no evidence, they have zero evidence that she's doing anything that's inconsistent with her representations about her abilities. We have zero evidence. That's what we talked about. They have nothing, right? Right. They have a reasonable belief that because there's a suspicion that because the kitchen worker position at Wynn is covered by a culinary agreement, and it's the same culinary agreement that they have with Caesars, so I think it's reasonable to assume that a kitchen worker position at Wynn is very similar to a kitchen worker position at Caesars. I don't think they have a good assumption that a kitchen worker position at Caesars is very similar to a kitchen worker position at Wynn. I don't think so. They have no idea, they have no evidence what she's doing for Caesars. Yes or no? Correct. So there are things you can do for Caesars that don't involve anything inconsistent with her scalability, right? Correct. So there's telepathy, right? Right, but this is a situation where if she was a kitchen worker at Wynn and she was an operator, a telephone operator... They don't know that. They don't know that. All they know is they go, she goes in, and she employs entrance. They try to find out something about what she's doing, but she probably doesn't have a telephone number, right? Is there anything that they knew that you couldn't tell you to go tell them, right? Well, not at that specific moment, but... So when I say at that point, they have nothing, and you keep arguing, and you're just wasting time. Sorry. So at that point, they had only... Nothing. Only what the surveillance department was able to do. Right. Right. So that's special enough for you to see what that officer does. Right. So then they wouldn't receive the surveillance report that says that she showed up for Wynn in her uniform, followed her to the Rails kitchen, and couldn't really see what she was doing there. But then they had a meeting with her because of her to Wynn, as though she was doing her kitchen work or job over at Caesars the day after she suffered a work-disease injury and said she couldn't work because of her restrictions at Wynn. So they met with her at the executive process meeting. At that process meeting, all the house employees tell their side of the story. She did indicate at that point, well, they were accommodating me. Okay, let's get some information on that. If they are accommodating you, if you're unlikely there, that's the information that we need. She never gave Wynn the names of the people who were accommodating her. So when Moise talks about the fact that Wynn didn't call over, if he would have just called you, because they didn't know who to call, Ms. Moise was in the best position to hold you there. Did they actually have the rate of fire investigators and make you have to figure out who is the school fire department that you should know? Well, actually... I can't figure that out. I think I can figure that out. I can keep on figuring it out. You don't think that I'm going to see you after figuring out who the supervisor is? I'm sorry, guys. We're talking about hotel, right? I'm sorry. Well, they're not going to see us. Yeah, I'm sorry about that. I'm going to have to move around. One hotel can't tell who to talk to. I don't know who to tell about who the supervisor is. I know that. It seems gorgeous on the surface. Well, yeah. I mean, it makes me so stop to the suspicion that they were looking at her. It just seems so petty and so unbelievable. Look at that. One can't figure out who to call. Well, first of all, ultimately, we did receive information that indicated that she was working full-time over there. But until we got that information, it was impossible to know the record. In the record, it shows that Ms. Moise worked in several different kitchens. She worked in Serendipity. She worked in Rails. She worked in the buffet. She worked in the room service kitchen. So there are a variety of different places. And again, without knowing who she was talking to, it would have been very difficult for her to observe. So I don't think it's impossible. So to your point, it's not impossible. But having been the person who worked over there, she says, I am working over there. They are giving me recommendations. So I'm not having to know what's the time. I'm not able to know. Right. And what happens to the products? They say, what's timing? We just can't figure it out. They have to provide information. Right. Well, they didn't know the times. So then they asked Ms. Moise to provide the information. If you're being accommodated, please provide us with that information. She had a union steward present. The union was also able to assist her in that. They tried, even after the termination, through the grievance process, to assist in that. But ultimately, no information was ever provided, indicating that Susan knew about the restrictions and that they were accommodating those restrictions. It was just a general list from one of the kitchens that she worked in from a patient who said, I didn't even remember her name, that she said, oh, here's those things. But that doesn't say, oh, yes, we knew. She told us that she had limited use of her right arm, and we were able to accommodate that, and we did so by only having her do this. And so based on the information that we had at the time, it would reasonably believe that Ms. Moise was working, encouraging her to do all that. You cannot work for another employer. You're doing the same job, doing the same functions, when you're saying you need to leave from us for it to... And in the space of an absence of evidence, right, she says that they haven't gathered any evidence as to how she did it, but she has failed to come up with evidence that proves the employee who is actually unemployed is doing it right or wrong. So that's the employee who has to gather evidence from Congress. When you look at a racial discrimination that an employer makes, it's similar to the pre-tips analysis. So she does need to prove pre-tips, and one of the ways you can prove... There's a lot of different ways you can prove pre-tips, and one of them is whether, for example, the company changed its solution. If they don't pick up the phone and call over and figure out the relevant person to talk to and say, Hey, you've got one of our employees working there. What is she doing? How about the fact that they don't bother to do that, something that any sentient human being who runs a business would know how to do? I mean, I'm just baffled by this claim that Wynn's Hotel and Casino cannot figure out what sees us, Supervisorial Storytellers, as they can for 30 minutes on the phone or on the Internet or by calling someone in and letting all of them in and figuring it out. I'm just confused. Perhaps Wynn could have tried to make the telephone call, so that, again, they did not have the names or the people to whom they should speak to. Ms. Wise had that information, but she did not provide it. The other thing to just kind of keep in the back of your mind is that sees us as a competitor of Wynn. It's not that they typically like to share information, especially when you're talking about employees. If you're concerned about your employees... I mean, you know, at that point, basically, it was just a big machine to know, you know, how to work. We're going to fix it, but essentially here, when we're looking at pretexts, which Ms. Wise's partners had established, you look at whether or not the company had evidence and whether it acted consistently with good evidence. And here, because of the workers' compensation aspect, it did report on this. Sure. That is not the policy. There is that e-mail from Stone making an off-reference to cutting back full duties, but as Steve Strickland pointed out, that's not the policy. It never has been the policy. The very fact that Ms. Wise... Well... Why haven't they put forward enough evidence to get to an example? Because we have to believe in all these motions from one to the other, one to three, is what I'm saying. Right. First, this was raised at oral arguments, so it wasn't really briefed below before the district court. However... And what is this? The issue of 100% yield policy. That was not part of the briefings before the district court was raised at oral arguments by Ms. Eagles. However, there still is enough evidence in the record to establish that that is not a policy, as Judge Friedman pointed out. Ms. Wise herself had had light duty on numerous occasions, and when she was on those light duty assignments, she had a lot of restrictions, no pushing and pulling over 10 pounds or whatever. So, because the very fact that she's received light duty, the very fact... Okay, so this happened on a Friday. She was released from the Kinsinger Medical Center at 3-11 on Friday afternoon. It was so late in the day. These restrictions were different from others. It wasn't just no pushing or pulling over 5 or 10 pounds. It was, quote, "...limited use of right arm," unquote. That is very nebulous. How do you accommodate limited use of right arm and even polishing self-aware and using your arm that might exacerbate the injury? So the reasonable thing to do was to put her on a leave until her follow-up appointment. Maybe she would have gotten better to the point where she would have had restrictions, which we're trying to deal with. So, I mean, how is that engaging in an interactive process? How is an unpaid leave a reasonable accommodation? That can't be right. I mean, if that were right, you could just basically fire someone by putting them on indefinite leave. A leave is a reasonable accommodation, especially if you're dealing with restrictions like this, where the restrictions were so severe that an immediate left-of-duty position was not a good one. I mean, she didn't ask. So if someone asks for an indefinite leave, it might be reasonable, but she's saying, I want right duty. How can they just unilaterally put her on an unpaid leave at that point? Under the ADA, a leave or an accommodation has to be reasonable and it has to be effective. And every court, including this one, has held that it is completely reasonable and effective. It's a requirement of the ADA. Well, no, but you see, I have no options. I don't have options. Putting a leave or an accommodation. Well, certainly, because it's so serious, it's just not like this was the entity. It might be because she's contagious. Okay, they find out, you know, she's not a contagious disease. They might just say, we'll put you out. I don't know if you're asking her out or saying unpaid leave, but you can't walk in. It's contagious. But what she says is, you know, I don't know if that's more of a science or something, but I might actually publish some other stuff. I don't know. Are you sure you can do that, Rebecca? As I said, Jerry, I don't know. Well, since this is true, this is how you interact with the process. You don't have to have a team to go with you. You don't have to talk to somebody to say, well, you know, let's see if we can gloss this stuff over. Right, like, well, no. She'll employ her to the APA, and under this court's ruling, you'll see... Okay, what if they ever come in and they talk about it? They, well, again, it was very late in the day. It was Friday afternoon. They just called it a night. It doesn't mean anything in Vegas, especially not in a Vegas hotel. That's, you know, that's just some business. So, you know, I guess it's fine. Let's see. How do you do this? Actually, certain departments do it more like workers' compensation. They don't just... Workers' compensation departments, certain departments... Well, so it's for the accused. The accused should just... Okay, I'm sorry. But it's a very elaborate process between the department and the workers' compensation in order to find, like, do you need, like, do these, this classroom through the workers' compensation division. But the employer, under the ADA, the employer gets to choose the reasonable accommodation, and then they can choose the most easiest, they can choose the easiest accommodation, they can choose the least expensive accommodation, as long as it's effective and true. So people don't pay to leave on some Monday morning when they should have come to a restaurant? Right, and then she did. There were further communications because she said, yes, if you find I'm out on leave, let me have my vacation paid, and that way I'm going to be covered through part of that. And ultimately, during that leave of absence, that was granted, even though she didn't specifically request it, she had surgery on her shoulder. She wouldn't have been able to work for a good four months. Before Monday morning. You don't know. That was, you're right, that was a few weeks later, but it was during the period of time that she was on her leave. On Monday morning. I mean, see, if we agree, either way, we keep the compensation or it's closing, but they open up again Monday morning, like, see, and then Monday morning, they move on, move on, move on, move on. Either way, it's a process. Right, so... Yes, they had further communications because she had talked about getting a vacation. They did process that paperwork so that she could get a vacation. That necessarily was a communication that happened that was part of the interactive process. So is your argument basically that she had to ask, she had to suggest what she could do with her left arm rather than you saying, what can you do with your left arm? I mean, it doesn't seem like there was any time when the employer said, what can you do? Well, it is a joint obligation. The company knows what types of jobs it has available. They are not obligated under the ADA to create a new position for a light duty or for anybody just because of the ADA. So obviously the employee is in a better situation to know what her limitations are through that, and her doctor asked me to come together and try to figure that out. Did they have us on Monday morning to say, well, tell us, say, hey, we have these other jobs available. We'll come in and talk about what jobs are available. No, but that question is still under her restrictions. I believe it's the use of the right arm, so... But the whole point is that she wanted to be able to do things without the right arm. Did they say, well, we couldn't deal with the thriving eyes and the push-on of these needs? But HR is opening up again Monday morning. Let's talk about all these other jobs we have. Did they do that? They had a discussion on Monday. The discussion itself, that discussion was just that you can't... I'm just saying yes or no answer. Did they have a discussion or an exchange coming in on a Saturday morning phone about what jobs you can do? I do not believe they discussed other jobs because her restrictions of limited use of right arms was still in place at the time, which would have made it very, very difficult for them to find anything. But they didn't tell me. They did nothing. I mean, the excuse, this is Friday night, it's too late, we'll give you a Friday night, we'll give you a weekend. It's Monday morning. They don't try and say, hey, let's see if there are things you can do. Yes or no? I do not believe that they had further discussions. There's no other record of questions. I don't believe it. They're posting off within, say, hey, we have some other jobs available, come in and see what you can do. I mean, does that make sense? No, there's no evidence. Why don't they have a duty to do that? Why isn't that part of the responsibility? Because the employer gets to choose the accommodation, and at this point, a leave of absence is a reasonable accommodation. I agree with you on that. It's a reasonable accommodation. It is. Every court in this country, including this court, has held that leave of absence, or leave of reasonable accommodation, especially if there are cases, and there are situations where the employee did not ask for it. It's the employer's choice to choose what it was. He says that, and it's a reasonable accommodation when an employee leaves and when it's not requested. I believe it's EEOC versus UPS. Supply chain solutions, anti-carbonates, anything of the sort. Well, I know that it says that leave and other types of accommodations are reasonable accommodations. I'm sorry, EEOC versus carbonates. UPS, supply chain solutions. Is that on? Okay. In the EPS supply chain solutions, it says the employer has the ultimate decision in selecting a reasonable accommodation. EPS versus? Supply chain solutions. Or is that EOC? EOC versus EPS supply chain solutions. Okay. And the employer has the ultimate decision in selecting the reasonable accommodation. It doesn't have to be the best accommodation, and the employer may choose the easier accommodation. Does it say anything about unpaid leave? I mean, that may be assuming that the accommodation will also kind of work. But unpaid leave is a good thing. So even if the United States appoints for itself, up to a year, about anything is reasonable accommodation. But when requested? Well, you don't have to select the accommodation that they bring in. There's a direct process. So if the employee is saying, you know, I really can't do anything. I'm just on surgery. I can't come back for a year. Please keep my job open. Then it may be reasonable to say, okay. But if the employee is saying, I want to work, the employer can just get rid of them by saying, okay, if we're putting you on unpaid leave, that's cheaper. I mean, the whole idea is that the employer is going to always do the cheapest thing. That's totally not right. But then the ADA, the employer is not obligated to create your job. So it's not like you need work available. We don't know. They don't call, kind of, and say, we've looked, and here's what's available. They don't say, this is the only job I can work for me. Nothing. They can say, you know, I don't need them. Well, you're on unpaid leave. Right. They were out on unpaid leave. The continual workers' compensation framework covers that. Or she ended up asking for her vacation pay to cover part of that, and then she was out for her surgery anyway. If you think that the case, like this one, where the employer shows unpaid leave, I can't say the employees will. But most things on unpaid leave, especially if they're talking about it, you let them talk. No, I keep saying potato, and you keep saying potato. My question is, I think I'm coming off to the point of a case where the employer shows unpaid leave rather than any other accommodations that the employee has obtained. Not on the topic yet. I can't, I'm sorry. Okay. Why don't you take the next 24 hours and see if you can come up with a case. Okay. Okay, you're going to be sole private, so you need to be able to do what you're supposed to be able to do. You're going to get these jobs. So that's all I've got to say. You go. I will do that, sir. Would you mind if I ask a brief question about a constant work environment? Because the district court indicates that your employees didn't identify any supervisor by name who engaged in the harassment. Due to her disposition, she identifies Rosa, is this, if you'll follow up here, follow up to 1214, is this Rosa Martinez, who's identified on page 213 as the manager, and who are Belinda and Victor. Are these supervisors or managers because she identifies them in her disposition? They are supervisors. So in other words, the district court was incorrect in saying that she does not identify any supervisor by name who was present or engaged in the harassment, or any of the harassment. Well, so she generally says that she meant management knew about this, but the thing is, there's not any other level of specificity as to what those supervisors or managers said. There's a variety of comments that she brings that were made, including things like, that woman, in Spanish, that woman, or mala, meaning that it doesn't necessarily kind of take any kind of national origin. It's just like a general discussion about who she is, or kind of a one point way of pointing her out to somebody else. But that is a rise to actual harassment under Title VII. It's just that it's not sufficient to let it into my training, and I don't go to the class. So the problem is, we don't know, even if one of those managers said something like that, we don't know if it was something like that, or something more severe than my manager. Does the district court, does it identify, in these general terms, that there was language and conduct that essentially could be possible, but that the record lacks any identification by her of any supervisors or managers involved when she's describing the activities of Rosa Martinez and Melinda and Victor? Isn't that fact that showed that there may have been a vicarious liability? Well, so again, here, with regards to value, there may be vicarious liability if that results in an intangible employment action to action, and that any of those comments, even if they were said, has nothing to do with the ultimate termination reason, which was regarding her working for another company while she was receiving workers' compensation. But there should be a separate stand-alone claim than a conflict of her complaint. Well, but it had nothing to do with that. There's no causal connections. Hostile environment is not a stand-alone claim of denial of equal opportunity. Well, yes, it would be, but if that's resulted in an intangible employment, that's the claim. I'm saying the requirement is not in and of itself an adverse circumstance that is actionable. Well, it might be, but an employer is only vicariously liable if it results in an intangible employment action. Could you show the quote? An employer is only vicariously liable if it results in an intangible employment action. And so here, there's no causal connection between the alleged harassment and her termination reason. So you don't keep somebody employed and just make miserable look on the circumstances on the basis that she's doing this, she's this, she's that. But as long as you don't fire her, she doesn't have any claim or protection under Title VII. No, because if you're here, one of the main problems with Ms. Boyce's case is she never complained to Employee Relations, which was kind of reasonable in this case because she went to Employee Relations when two other cases took complaint about minor workplace incidents. She's a lead at that. When she had a sport, it was taking her grades at the most inopportune times, and that was upsetting to Ms. Boyce. She went to Employee Relations. Employee Relations met with her. They met with the other employee. They told the other employee, look, oh, yeah, Boyce, this would mean you have to follow her direction. You can't just take grades. And it was a result of her satisfaction. So she said she tried to file a complaint this time, and she really got the runaround. And you say, or the District Court says, that under your policy, she could have complained to the vice president of Human Resources or the legal department or her division vice president or other member of management. She felt comfortable with. Are you aware of any other employees who have worked in Boyce's kitchens who have previously complained to the vice president of HR or the legal department? Not that I can think of. I think I'm the outside director in this case anyway, but not that I can think of off the top of my head. But my point is, she has gone to Employee Relations and had other complaints that were completely unrelated to the allegations contained in her complaint, and had those resolved to her satisfaction. So it's completely unreasonable for her not to have gone back to Employee Relations, especially when she admitted in her deposition that the Employee Relations Council was very helpful and very fair. So it's unreasonable for her not to do that. And I might point out the other two times that she went to Employee Relations,  You don't have to show somebody right away. You submit it in writing, and then they read it, and then you send an appointment with you, they meet with you, they talk with any other people that you have to, that they have to get to the bottom of this, and that's exactly what happened on the other two times. So she felt like she was getting very caught around. She just had to submit it in her complaint in writing, and it would have been addressed. Thank you. Ian? Okay. With respect to the workers' compensation, Employee Duty Policy, it's an ER volume 2, pages 65 to 69. If you review that, it's very clear. They give practically everybody who has to apply duty work they don't want lost on their clients in the workers' comp, and that's why they have this very detailed policy that they provide to people. They didn't do it in this case. In fact, on ER volume 2, page 71, is the summary work email from Monday, May 20th, where it says, Please note that C cannot return to work until she has released full duty. Okay, that is saying, at least in perspective, only in a voice-led policy, that she has to be 100% healed. It didn't take into account that this hotel has thousands of employees, thousands of jobs, and what he's saying is that she can't come back to work until she has full duty, even if we have something else. They have lots of different jobs, which is probably easier to do, and they never got the interactive process with her. The other thing I wanted to mention briefly was she was not asked about how Caesars Palace was accommodating for her workers providing that you don't have to be sexually fired, and it's clear she got that through the union, the district court, as well as on Caesars Palace lettering. Again, that is just non-union with that. Those are some of my most favorable points. Your Honor, that's what's going on here in Minnesota through your application for reimbursement. Thank you. Thank you.  Thank you. Thank you. We are adjourned.
judges: Kozinski, Friedland, Arterton